UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERCA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. |
| $4,000,000.00 IN FUNDS VOLUNTARILY TURNED OVER FOR SEIZURE BY BLACKFOREST REAL ESTATE ADVISORS LLC; | ) ) ) |
| | ) |
| $3,000,000.00 IN FUNDS VOLUNTARILY TURNED OVER FOR SEIZURE BY BLACKFOREST REAL ESTATE ADVISORS LLC; AND | ) ) ) |
| | ) |
| $1,000,000 IN FUNDS VOLUNTARILY TURNED OVER FOR SEIZURE BY BLACKFOREST REAL ESTATE ADVISORS LLC, | ) ) ) |
| | ) |
| Defendants. | ) |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America brings this Verified Complaint for Forfeiture *in Rem* against the three amounts of U.S. currency captioned above (collectively the "Defendant Property"). The United States alleges as follows in accordance with Supplemental Rule G of the Federal Rules of Civil Procedure.

1. This is a civil action *in rem* brought by the United States pursuant to Title 18, United States Code Section 981 seeking forfeiture of all right, title, and interest in the Defendant Property, further described as:

    a. $4,000,000.00 in funds from Blackforest Real Estate Advisors LLC wired to the U.S. Marshals in the Eastern District of Missouri on January 2, 2020 from Bank of America account ending in 4747;

1

    b.  $3,000,000.00 in funds from Blackforest Real Estate Advisors LLC wired to the U.S. Marshals in the Eastern District of Missouri on January 16, 2020 from Bank of America account ending in 4747; and

    c.  $1,000,000 in funds from Blackforest Real Estate Advisors LLC wired to the U.S. Marshals in the Eastern District of Missouri on February 5, 2021 from Bank of America account ending in 4747.

  2.  The Defendant Property is subject to forfeiture because it constitutes or is traceable to proceeds of violations of Title 15, United States Code, Section 78dd-1, *et seq.* or a conspiracy to commit such offenses and is property involved in transactions or attempted transactions in violation of Title 18, United States Code Sections 1956 and 1957 or a conspiracy to commit such offenses, or is traceable to such property.

  3.  Specifically, this action arises out of a scheme whereby Nervis Gerardo Villalobos-Cardenas and others solicited bribes and kickbacks to facilitate contracts and payments to co-conspirators from Petróleos de Venezuela S.A. ("PDVSA"), Venezuela's state-owned and state-controlled oil company. As part of the scheme, Villalobos-Cardenas' and others corruptly assisted two Venezuelan financial brokers, brothers Ignacio and Luis Oberto ("Oberto Brothers"), to secure a lucrative loan contract with PDVSA. The Oberto Brothers used PDVSA's loan repayments to fund black market currency transactions. Villalobos-Cardenas' subsequently invested some of the proceeds he derived from this scheme – the Defendant Property – into two properties in Brooklyn, New York.

  4.  This Court has jurisdiction over the subject matter pursuant to Title 28, United States Code Sections 1331, 1345, and 1355 because this is a civil action arising under the laws of the United States, a forfeiture proceeding, and has been brought by the United States.

5.	This Court has jurisdiction over the parties pursuant to Title 28, United States Code Sections 1345 and 1355 because this is a forfeiture proceeding, and because it has been brought by the United States.

6.	Venue is proper in the Eastern District of Missouri pursuant to Title 28, United States Code Section 1355 because an act giving rise to the forfeiture occurred in the Eastern District of Missouri and the Defendant Property is located in this District.

## FACTS GIVING RISE TO FORFEITURE

7.	During all times relevant, PDVSA was the Venezuelan state-owned oil and natural gas company. PDVSA and its subsidiaries and affiliates, including U.S.-based affiliates, were responsible for the exploration, production, refining, transportation, and trade of oil and natural gas from Venezuela. PDVSA officers and employees were "foreign officials" as that term is used in Title 15, United States Code, Section 78dd-2(h)(2)(A).

8.	PDVSA awarded contracts through a competitive bidding process and through sole source contracts, which were not subject to a competitive bidding process. All contracts needed to be approved by senior PDVSA employees.

### Venezuelan Currency Exchange Schemes

9.	Historically, many Venezuelan citizens have sought to protect their wealth from local economic, political and social factors by converting it to more stable banking systems in Europe and the United States. To avoid a flight of capital, the Venezuelan government restricted the outflow of funds from their financial systems by imposing numerous barriers on currency exchange. In recent years, and during the time relevant here, the Venezuelan government enacted various policies and regulations which made the transfer of funds, or the exchange of those funds to foreign currencies, difficult and complex.

10. Upon information and belief, in or about February 2003, Venezuela enacted currency exchange controls which fixed the exchange rate of the Venezuelan Bolivar to the U.S. Dollar ("USD") at a rate controlled by the Venezuelan government. The government imposed restrictions on foreign currency exchange rates and the procedures used to obtain foreign currencies. The government retained the authority to sell USD to individuals and corporations for limited use purposes identified by the government. USD sold by the government had a preferential exchange rate. However, USD was sold on the black market for much higher exchange rates. The government also maintained a supply of USD to pay for things and uses identified by the government.

11. For example, upon information and belief, in 2014 an individual could exchange $10 million USD for 600 million Bolivars at a black market rate. Then, if the individual had access to the government preferential rate, the individual could convert that same 600 million Bolivars into $100 million USD – basically buying $100 million USD for $10 million USD in two transactions.

12. Similar dynamics applied at the times relevant here based on the prevailing preferred and black market exchange rates.

13. The difference between the government preferred rate and the black market rate created opportunity for fraud, and incentivized those that engaged in the currency exchange scheme to seek sources of USD at preferred rates.

14. PDVSA, as Venezuela's primary source of income and USD, presented an attractive target to fund corrupt foreign exchange schemes. Accordingly, these schemes frequently occurred at PDVSA, with PDVSA officials frequently facilitating these schemes in return for bribes and kickbacks.

## The Loan with PDVSA

15. In 2012, the Oberto Brothers endeavored with others set up a corrupt currency exchange scheme to exploit the differences between the preferential and black market rates.

16. In order to secure a supply of USD, in or about March 2012, the Oberto Brothers secured an approximately 17 billion Bolivar loan agreement between PDVSA and Administrator Atlantic ("Atlantic"), a Venezuelan real estate company owned by two people including an attorney affiliated with the Oberto Brothers.

17. The terms of the loan contract called for multiple payments of Bolivars to be disbursed into PDVSA's accounts in Venezuela with the loan repaid to Atlantic in USD and Euros at the Venezuelan government's preferred/fixed exchange rate. The loan contract also preauthorized the reassignment of the company and accounts which could receive the loan repayments.

18. The loan acted as a purportedly legitimate mechanism for the Oberto Brothers to obtain USD from PDVSA at the lower government preferential exchange rate to fund exchanges on the black market at a much higher rate – resulting in a substantial profit.

19. On or about three days following the execution of the loan, the repayment rights under the contract were reassigned from Atlantic to Violet Advisors, a Swiss shell company controlled by the Oberto Brothers with a Swiss bank account(s).

20. The reassignment from Atlantic to Violet Advisors acted to conceal the Oberto Brothers as the true recipient of the repayments and allow the repayments to go to off-shore accounts under control of the Oberto Brothers. The use of off-shore entities makes it difficult to trace the source and destination of these transactions. Many of these off-shore entities are located in jurisdictions with strong bank secrecy laws, such as Switzerland. Verifying the true ownership

of the off-shore company and source funds in such transactions is very difficult in light of these considerations, creating an inherent risk for United States banks which allow their customers to participate in such transactions. Domestic registration of money transmitting businesses such as the one described below would require records to be kept and reports to be made that might provide transparency as to the nature of those transactions; conversely, the failure to register permits such businesses and their customers to conceal the true source and nature of those transactions.

21. The rights were again reassigned from Violet Advisors to Welka Holdings, another Swiss shell company controlled by the Oberto Brothers, at the behest of Swiss bankers concerned that the high volume of transactions with Violet Advisors was drawing attention.

22. Between March 2012 and March 2013, Violet Advisors and Welka Holdings received approximately $4.85 billion USD from PDVSA in loan repayments.

Currency Exchanges

23. Usually within 48 to 72 hours of receiving a loan repayment from PDVSA, the Oberto Brothers typically transferred USD to direct buyers or resellers/brokers. The Oberto Brothers entered into these transactions to profit from individuals and companies that resorted to the black market to obtain USD.

24. Clients purchasing USD deposited Venezuelan Bolivars into Atlantic's bank accounts held at a Venezuelan bank. These accounts were titled under the name of Atlantic or into accounts under the name of entities controlled by a friend of one of the Oberto Brothers. Bolivars were transferred to PDVSA's accounts pursuant to the loan's terms by internal bank transfers.

25. Hjalmar Gibelli-Gomez, a Venezuelan national, owned a construction company and an insurance company called Resguarda Sociedad De Corretaje De Seguros, C.A. ("Resguarda"). Gibelli-Gomez admitted that, in or around February 2003, he began purchasing

and selling USD and Venezuelan Bolivars on the black market, and that he utilized Resguarda and its affiliated accounts to do it. USD derived from the currency transactions, including with Violet Advisors, were deposited into Resgaurda accounts held at Wells Fargo Advisors, located in St. Louis, within the Eastern District of Missouri.

The Bribery Scheme

26. Villalobos-Cardenas was the Deputy Minister of Energy in Venezuela until 2006. Upon leaving that position, Villalobos-Cardenas maintained connections with officials at PDVSA, Venezuelan electricity companies, and within the Venezuelan government.

27. Beginning in at least 2011 until at least 2013, Villalobos-Cardenas, himself and with others, solicited bribes and kickbacks to obtain payments on existing PDVSA invoices and secure contracts for individuals and entities with PDVSA and other government entities in exchange for payment.

28. Villalobos-Cardenas laundered the proceeds of the bribery scheme through numerous financial transactions, including through international wire transfers to and from Swiss bank accounts, among others, in the names of various companies. Villalobos-Cardenas sought to conceal the nature of the scheme by directing bribe payments to be sent to various recipients such as companies, intermediaries, his attorney, and others.

29. On August 23, 2017, Villalobos-Cardenas and his co-conspirators were charged in the Southern District of Texas for conspiring to commit money laundering and violating the Foreign Corrupt Practices Act ("FCPA"), among other charges, stemming from this conduct. *See* Case No. H-17-514-S (4:17CR514). The indictment is incorporated by reference herein.

30. As part of the scheme, Roberto Enrique Rincon-Fernandez, a U.S. lawful residence, controlled with others several U.S. companies that Rincon-Fernandez used to secure contracts with

7

PDVSA for the supply of equipment and services. Rincon-Fernandez was approached by Villalobos-Cardenas and others to help secure lucrative contracts between Rincon-Fernandez's U.S. based companies and PDVSA. Rincon-Fernandez was forced to pay kickbacks to Villalobos-Cardenas and other co-conspirators before and during the contract acquisition process. Rincon-Fernandez also paid Villalobos-Cardenas to win future contracts. Villalobos-Cardenas directed Rincon-Fernandez to his attorney to set up entities for Rincon-Fernandez to use to conduct these payments. Rincon-Fernandez never paid Villalobos-Cardenas directly but made the payment to corporations that Villalobos directed him to pay.

31.     In 2016 in the Southern District of Texas, Rincon-Fernandez admitted to the aforementioned conduct and pleaded guilty to a violation of the FCPA, conspiring to violate the FCPA, and a tax charge. *See* Case No. 4:15CR654-1.

32.     Upon information and belief, in order to secure a loan contract of such magnitude, the Oberto Brothers sought a significant direct relationship with Rafael Ramirez, Venezuela's oil minister from 2002 to 2014 and PDVSA president between 2004 and 2014, and other PDVSA officials who had the authority to approve contracts.[1] Villalobos-Cardenas maintained a relationship with Ramirez and officials at PDVSA. Villalobos-Cardenas also held himself out as someone that could facilitate contracts in exchange for a percentage of the contract price. Accordingly, the Oberto Brothers engaged Villalobos-Cardenas to act as the principal go-between with Ramirez and others to facilitate bribes to obtain approval of the loan contract with Atlantic. In return, Villalobos-Cardenas received compensation in the form of percentage shares from the funds generated by the loan contract.

---

[1] Upon information and belief, in 2014, Ramirez served as Minister of Foreign Affairs, and then subsequently served as Venezuela's Permanent Representative to the United Nations. Ramirez ceased serving the Venezuelan government in 2017.

33. It was further part of the scheme that Villalobos-Cardenas orchestrated a bribe of $12 million USD to Abraham Edgardo Ortega from the Oberto Brothers to ensure Ortega's cooperation in allowing the loan repayments to Violet Advisors to go through, and that those repayments were paid in USD. From August 2004 through March 2016, Ortega held various high-ranking positions within PDVSA, including PDVSA's executive director of financial planning. Villalobos-Cardenas introduced Ortega to his attorney who assisted Ortega in establishing shell companies to receive the $12 million bribe. In the Southern District of Florida 2018, Ortega pleaded guilty to conspiring to commit money laundering, including for accepting bribes for his participation in this scheme. *See* Case No. 1:18-cr-20685-KMW-4.

34. The Oberto Brothers paid Villalobos-Cardenas roughly $90 million in USD as his share of proceeds from the loan contract scheme. In order to conceal the nature of the funds, they were directed to accounts associated with two off-shore shell companies, Mirabelle Ocean and Delphi Investments, controlled by Villalobos-Cardenas. Specifically, on or about April 3, 2012, $30 million USD derived from the loan contract scheme was transferred from accounts held by Violet Advisors, controlled by the Oberto Brothers, to Delphi Investments. On or about September 29, 2012, approximately $31 million USD was transferred from Violet Advisors to Mirabelle Ocean. Then, on or about October 12, 2012, approximately another $29 million USD was transferred from accounts held by Violet Advisors to Mirabelle Ocean.

The Defendant Property

35. In 2012, Villalobos-Cardenas wired a total of $8 million USD (the Defendant Property) of funds derived from the scheme from a Swiss bank account associated with Mirabelle Ocean to account(s) associated with Blackforest Real Estate Advisors in order to invest in two parcels of real estate located in and around Brooklyn, New York.

36. On January 2, 2020, January 6, 2020, and February 5, 2021, Blackforest Real Estate Advisors voluntarily wired $4 million USD, $3 million USD, and $1 million USD respectively (the Defendant Property) to an account of the U.S. Marshal's Service, Eastern District of Missouri. Since that time, the Defendant Property has been in the custody and control of the U.S. Marshal's Service in Eastern District of Missouri.

## COUNT ONE – FORFEITURE AS PROPERTY INVOLVED IN MONEY LAUNDERING
## 18 U.S.C. § 981(A)(1)(A)

37. Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

38. Villalobos-Cardenas and others carried out a scheme to influence and bribe officials within PDVSA in order to facilitate the award of a loan contract with the Oberto Brothers in violation of the FCPA and the laws of Venezuela, and used the proceeds to conduct financial transactions to promote the carrying on of the scheme and to conceal or disguise the nature, location, source, ownership and/or control of the proceeds in violation of 18 U.S.C. § 1956. Villalobos-Cardenas and others further used the criminal proceeds from the scheme to conduct monetary transactions in an amount greater than $10,000 in violation of 18 U.S.C. § 1957. Or they engaged in a conspiracy to commit such offenses.

39. The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## COUNT TWO – FORFEITURE AS PROPERTY INVOLVED IN FOREIGN CORRUPT PRACTICES
## 18 U.S.C. § 981(A)(1)(C)

40. Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

41.    Based on the above, the Defendant Property constitutes or is traceable to proceeds of violations of 15 U.S.C. §§ 78dd-1 et. seq. or a conspiracy to commit such offense. The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully Submitted,

SAYLER A. FLEMING
United States Attorney

<u>/s/ Stephen Casey</u>
STEPHEN CASEY, #58879(MO)
Assistant United States Attorney
111 South 10th Street, Suite 20.333
Saint Louis, Missouri 63102
Telephone: (314) 539-2200
stephen.casey3@usdoj.gov

## **VERIFICATION**

I, Daniel Sanders, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer with the Drug Enforcement Administration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: __12-20-2024__
                (date)

_____
DANIEL SANDERS
Task Force Officer
Drug Enforcement Administration